GRIMSTAD HEATING & AIR CONDITIONING COMPANY, Plaintiff-Appellant, *v.* SHAPLAND CONSTRUCTION COMPANY, INC., *et al.*, Defendants-Appellees.

Fourth District   No. 15156

Opinion filed May 3, 1979.

Robert W. Ohlsen and James R. Coryell, both of Walden, Cole, Ohlsen & Coryell, Ltd., of Decatur, for appellant.

Busch, Harrington & Porter, of Champaign, for appellees.

Mr. JUSTICE GREEN delivered the opinion of the court:

This appeal arises from an action brought in the circuit court of Champaign County by a subcontractor to recover sums allegedly due it from a contractor for work done on the new Commercial Bank building in Champaign. The trial court awarded judgment to the subcontractor of $4000 and that party, plaintiff Grimstad Heating & Air Conditioning Company, appealed. Defendants are Shapland Construction Company, Inc., the general contractor, and the Commercial Bank of Champaign, as trustee.

Plaintiff's theory in the trial court, to which it continues to adhere on review, is that the work it performed was done pursuant to two contracts between it and Shapland, one covering the basement, first floor, and "roughed in" second floor of the building and the other covering the completion of the second floor. The trial court agreed with the theory of Shapland, however, that only one contract existed between the parties, that such contract covered all of the work performed by plaintiff, and that the price therefore was included in a bid submitted to Shapland by

plaintiff prior to the awarding of the general contract. Plaintiff contends on appeal that the court's ruling was contrary to the manifest weight of the evidence. It also alleges error in the court's refusing of certain trial testimony.

The evidence indicated that in preparation for the construction of the new Commercial Bank building in Champaign, general contractors, including defendant Shapland, were invited to submit bids. Such bids were to be made up of a base bid and bids for "add alternates." The alternates provided different methods by which the floors other than the ground floor and basement of the proposed building could be completed. Different add alternates provided different methods for the completion of a given floor as to a specific function (e.g., heating, furnishings, etc.).

Prior to the date for the general bids, Shapland contacted plaintiff regarding a bid for the heating and air conditioning work called for by the plans for the building. Plaintiff telephoned Shapland on the date of the bidding and submitted a bid consisting of a base bid and bids for 10 add alternates relating to that work. Plaintiff's bid was relied upon and used by Shapland in bidding for the entire job and Shapland was subsequently awarded the general construction contract. At trial, defendants introduced as a business record a memorandum of plaintiff's telephoned bid to defendant Shapland. That memorandum showed a base bid of $101,000 and figures for add alternates H-1 through H-10, totalling (with the base bid) $232,000. Plaintiff did not introduce any evidence disputing these figures.

One of plaintiff's contentions is that its telephone bid was for the construction of a building consisting of four stories and a basement and that since, following the initial bidding, a building consisting of a basement and two floors above ground was decided upon, subsequent dealings between the parties constituted the agreements pursuant to which the work was performed rather than the original bid. A detailed review of the trial testimony is here in order.

Elmer Grimstad, president of plaintiff Grimstad, and Cloyd Smith, vice president of Shapland, gave conflicting testimony at trial. Grimstad stated that the initial bid telephoned to Shapland was for a proposed five-story building (four floors and a basement) in its entirety and that after submission of that bid, Smith asked him to rebid as to the cost for work on the basement and first floor and "roughing in" the second floor of the building. Grimstad testified to giving Smith a price for this work over the phone and to confirming the price with a letter of October 25, 1973. That letter designated a "contract price" of $101,000 and included reference to a few alternates. It is not disputed that plaintiff was paid the amounts set forth in the letter and that these figures were consistent with the figures submitted in plaintiff's initial bid.

Witness Grimstad also stated that he was contacted by Fred Kallmayer of Shapland in July of 1974 regarding the completion of the second floor and, to this end, Jack Brandenburg, vice president of plaintiff company, sent Shapland a letter of July 31, 1974, which quoted a price of $60,034. The letter requested Shapland to accept the offer by signing a copy. That was never done.

Cloyd Smith, on the other hand, testified that the bidding for the project was set up with the add alternates so that the owners could build as much or as little as they chose of the building beyond that provided for by the base bid. He stated that he had informed Mr. Grimstad on that day of the bidding "that it looked like I had a job and that he had a job." Prior to June 20, 1973, the witness told Mr. Grimstad that the building would be two stories and a basement. He also stated that he had interpreted plaintiff's letter of October 25, 1973, as a confirmation of what the parties knew, at that time, was to be completed, including roughing in the second floor.

During further examination, Smith testified that he had not asked Kallmayer to obtain a price from plaintiff on the completion of the second floor and that he did not remember seeing and never agreed to the terms of the July 31, 1974, letter. Smith also stated that Kallmayer was not an officer of Shapland and was not authorized to make or change contracts with subcontractors.

Witness Smith testified that the amount and quality of items called for in the bid for the original add alternates for the second floor were substantially the same as those actually used in completion of that floor. No evidence to the contrary was presented by plaintiff. The architect for the project testified that the inclusion of add alternates in the plans was customary and enabled bids to be made before work started rather than as the job progressed even though all plans were not finalized.

The deposition of Jack Brandenburg was taken prior to trial and was admitted into evidence by stipulation of the parties. His testimony substantially corroborated the essential parts of Grimstad's testimony concerning the October 25, 1973, and July 31, 1974, letters. He further stated that he was contacted by Fred Kallmayer of Shapland in June or July of 1974 concerning work on the second floor not covered by the October 25, 1973, letter and asked for a bid thereon. He identified his letter of July 31, 1974, as containing a bid therefore of $60,034. Brandenburg stated that the letter followed a telephone conversation between him and Kallmayer. According to the witness, during that conversation he had told Kallmayer of the $60,034 price, Kallmayer responded that such was higher than under the original alternatives, he, Brandenburg, stated that increases in material over time caused the change, and Kallmayer responded, "Well, go ahead with the project."

Brandenburg admitted that no one from Shapland signed either the October 25, 1973, or the July 31, 1974, letter.

Defendant Shapland introduced a document entitled "final waiver of lien" for the "Commercial Bank Building" executed by Elmer Grimstad as president of plaintiff on December 19, 1974. The parties agree that at that time, Smith and Grimstad agreed that an additional $4000 was due to plaintiff. Grimstad testified that he signed the document because of faulty information given to him by his office and that an additional sum was actually due.

Plaintiff contends that the letters of October 25, 1973, and July 31, 1974, constituted the two contracts between it and Shapland and that the parties were bound by the prices as contained therein. There is no question that if only one contract existed between the parties and the basis thereof was plaintiff's initial bid, the amount awarded in the trial court's judgment—that admitted by plaintiff to be owing to defendant—was proper.

We find no merit in plaintiff's contention that its original bid was conditioned upon a five-story building being built. It maintains that Shapland's subsequent acts constituted only a partial acceptance which was not enough to give rise to a contract. It relies on *C. Iber & Sons, Inc. v. Grimmett* (1969), 108 Ill. App. 2d 443, 248 N.E.2d 131, and *Brook v. Oberlander* (1964), 49 Ill. App. 2d 312, 199 N.E.2d 613, both of which involve claims that a general contractor did not accept a subcontractor's offer as proposed. In *C. Iber & Sons*, bids were requested on three items and an alternate. The court ruled that a contractor's acceptance of one of the items and the alternate was not an acceptance of the bid and did not form a contract. In *Brook*, the bid specifically stated that no contract would be formed unless a written agreement was executed by the parties and no such document had been executed. The court held that no contract was formed.

■■ Here, plaintiff's bid was oral and contained no provision similar to that in *Brook*. The documents clearly indicated that a base bid was to be made and that additional bids were on items that would be alternates which might not be built. There is no dispute that the bids made over the phone from Grimstad to Smith were stated in terms of a base bid and bids on alternates. The trial court's determination in favor of defendants on this question was clearly not contrary to the manifest weight of the evidence.

More difficult to resolve is the question of when and where Grimstad's bid was accepted. Smith testified of telling Grimstad on the day the bids were opened that "it looked like" Shapland had a job "and that" Grimstad "had a job." Smith also testified to having told Grimstad prior to June 20, 1973, that the building would be two stories and a

basement. The bidding documents, as explained by the testimony of the architect, contemplated that the decision as to the alternate plans for the second floor would be determined as the work progressed. Plaintiff proceeded to commence the work. Under this evidence the trier of fact could have concluded that plaintiff and defendant Shapland agreed that plaintiff would perform the work agreed to in the base bid and the alternates as later selected for the prices stated in plaintiff's bid.

As plaintiff's October 25, 1973, letter set forth the same prices as the original bid, the trier of fact could have found this to be merely a confirmance by plaintiff of the contract price for the work which it had been assigned by that time. The letter was prefaced by this statement: "This is to confirm our prices for the above project as follows."

No testimony was introduced to directly dispute Brandenburg's deposition testimony that Kallmayer told him to go ahead and complete the work for $60,034. However, no testimony was introduced to show that Kallmayer had authority to contract on behalf of Shapland and Smith testified that he had no such authority. Moreover, the subsequent letter of July 31, 1974, by Brandenburg to Shapland begins "Attention: Fred Kallmayer," continues, "We are pleased to quote our price of $60,034.00" to do certain work, and, after describing the work, concludes, "We * * * sincerely hope we *may* serve you" (emphasis added). The letter requested a signature on behalf of Shapland. Its tenor was that of an offer and not a confirmation of a previous oral agreement. The trier of fact could have determined that no further agreement was entered into between the parties concerning the subject matter of the letter and that an original agreement based on the original bids was still in force. It is unlikely that Grimstad would have signed the lien waiver agreement had he then believed that an additional contract arising from the Kallmayer conversation and the letter had been entered into.

■■ The trial court's ruling awarding $4000 to plaintiff was not contrary to the manifest weight of the evidence.

During the course of the trial, Elmer Grimstad was called as a witness by defendants pursuant to section 60 of the Civil Practice Act and questioned. Later, on examination by plaintiff's counsel, Grimstad was asked whether he could acquire materials at discount prices by ordering large quantities. Defendants' counsel's objection to the question was sustained and the matter was not further pursued. On appeal, plaintiff maintains that the court should have permitted witness Grimstad's response.

However, plaintiff failed to make a proper offer of proof as to the answer that the witness would give. More importantly, we fail to see any materiality or relevance to any likely answer to the question. As we have indicated, we do not accept plaintiff's theory that its bid was conditioned

on the building of five stories. Even if the trier of fact accepted plaintiff's theory that two contracts existed, each would be governed by the bid made by plaintiff therein, regardless of whether it could acquire materials cheaper in quantity.

■■ The refusal of the evidence was not error.

For the reasons stated, we affirm.

Affirmed.

MILLS and TRAPP, JJ., concur.